# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| RIGOBERTO QUILES,<br><br>        Plaintiff,<br><br>vs.<br><br>ALAN MARTIN JOHNSON,<br><br>        Defendant. | No. 4:16-cv-00220-JAJ<br><br>**ORDER** |

This matter comes before the Court pursuant to Defendant's June 8, 2017 Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. [Dkt. No. 24] Plaintiff resisted Defendant's motion on June 29, 2017. [Dkt. No. 26] Defendant replied to the resistance on July 6, 2017. [Dkt. No. 32] For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

Plaintiff Rigoberto Quiles' ("Quiles") First Amended Complaint contains three counts, alleging negligence, negligence per se, and gross negligence against Johnson. [Dkt. No. 18] Quiles alleges that he was off-duty in the sleeper berth of a semi tractor-trailer ("the semi") when Johnson, the driver, fell asleep at the wheel, causing the semi to crash and Quiles to suffer severe injuries. *Id*. Quiles claims damages for: past and future medical expenses, past lost wages, loss of future earning capacity, past and future physical and mental pain and suffering, past and future loss of full function of the mind and body, permanent disfigurement, and emotional distress. *Id*.

Defendant Alan Johnson ("Johnson") admitted in deposition that he was wholly responsible for the collision. [Dkt. No. 24] However, he disputes that he is liable due to Quiles. *Id*. Johnson claims that Quiles was dually employed by Swift Transportation Company of Arizona ("Swift") and Johnson during an apprenticeship, and as such, the exclusive remedy provision of Iowa's Workers' Compensation statute bars this suit. *Id*.

Quiles resists the motion, arguing that there is no express contract for hire between the parties, genuine issues of material fact exist as to whether an implied contract for hire existed, the cases Johnson relies upon are distinguishable from this case, and there are other genuine issues of

material fact related to Quiles' negligence claims. [Dkt. No. 26] Quiles asks that the Court deem the allegations of Count III of Quiles' First Amended Complaint admitted because Johnson failed to answer or otherwise plead to the First Amended Complaint. *Id*. Johnson cured this defect in his Answer to Plaintiff's Amended Complaint, and the Court declines to deem the allegations admitted on the basis of failure to plead correctly. [Dkt. No. 31]

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

On December 6, 2014, Johnson and Quiles began a team-driving arrangement.[1] Johnson was the owner-operator of the semi tractor-trailer ("semi") and an independent contractor of Swift, and Quiles was a commercial driving trainee employed by Swift. At all relevant times, Johnson was a citizen and resident of Chaska, Minnesota; at all relevant times, Quiles was a citizen and resident of Chicago, Illinois. Team driving allows the operation of a semi for 22 hours a day: one driver drives for 11 hours, while the other driver is off-duty for 10 of those 11 hours, then the drivers switch places. As a commercial trainee driver, Quiles was participating in a mandatory apprenticeship program arranged by Swift. Before being eligible to drive alone, commercial trainee drivers are required to complete at least 200 hours behind-the-wheel ("BTW") with a mentor driver. Once a commercial trainee driver has completed 50 of those hours, he or she is eligible to participate in a team-driving arrangement at the discretion of the mentor driver. Quiles had previously been paired with another mentor; he terminated that pairing because he was dissatisfied with the mentor's work habits. After discussing the status of his apprenticeship with him, Swift then paired Quiles with Johnson so that Quiles could complete the program. Quiles had completed at least 50 hours with his previous mentor, and the parties began team driving immediately after meeting.

On December 10, 2014, Johnson fell asleep at the wheel of the semi that he was driving, which caused the semi to leave the roadway and crash. The collision occurred on Interstate 80 in Adair County, Iowa. Johnson testified at his deposition that he accepts full responsibility for the collision because he knowingly operated the semi at an unsafe level of fatigue. He slept three hours the night before, got up, began driving, and 42 minutes later fell asleep while driving. He

---

[1] Unless otherwise noted, the following undisputed facts are taken from: (1) Docket Number 18, Plaintiff's First Amended Complaint; (2) Docket Number 24 and accompanying exhibits, [Defendant's] Motion for Summary Judgment; (3) Docket Number 26 and accompanying exhibits, Plaintiff's Brief in Resistance to Defendant's Motion for Summary Judgment; (4) Docket Number 26-4, Defendant's Response to Request for Admissions; and (5) Docket Number 31, Answer and Jury Demand to Plaintiff's Amended Complaint.

acknowledges that he had multiple opportunities to pull off the road at rest stops but chose not to do so even though he was aware of his obligation to operate the semi with the requisite level of alertness.

Quiles was a passenger in the semi at the time of the collision, and Quiles was not in any way at fault. At the time of the collision, Quiles was off-duty, observing a ten-hour rest period in the sleeper berth of the semi as required by regulations. The sleeper berth of the truck is designed for use by the off-duty driver while the on-duty driver operates the vehicle. When in the sleeper berth, the off-duty driver is not in a position to watch the other driver or control his actions. In the case of a mentor driver, the most the mentor can do is monitor data, such as the drivers' speed, through an app on his phone.

At no point did Johnson and Quiles sign an agreement with each other; they each operated under their respective agreements with Swift. At all relevant times, Johnson was an independent contractor with Swift, not an employee. His signed Independent Contractor Agreement includes the following statement:

> Upon request of CONTRACTOR, CONTRACTOR may be eligible, in COMPANY'S sole discretion, to participate in the COMPANY'S Driver Mentor Program, CONTRACTOR will pay COMPANY $0.05 per loaded dispatched mile during the period of time the COMPANY'S driver trainee is assigned to the CONTRACTOR'S truck. The COMPANY'S driver trainee shall remain a COMPANY employee during the period of time he/she is assigned to the CONTRACTOR'S truck. Any driver trainee shall be considered a loaned employee or borrowed servant under applicable law.

Johnson admits that he was operating under Swift's dispatch and operating authority, which covered matters such as what cargo he would carry and where to pick it up and drop it off.

Quiles was an employee of Swift; Swift paid his wages, any employment benefits, and carried the appropriate workers' compensation insurance for him. Swift had the sole authority to hire Quiles and to terminate his employment with the company. Swift provided Quiles with a handbook, including a "VIP" packet of "Very Important Paperwork." This packet included an Acknowledgment and Agreement stating that Quiles would be participating in a 200-hour BTW "apprenticeship program."

> Once a Driver has successfully completed a "Truck Driving Course" and has been employed with Swift Transportation Co., Inc., that Driver must complete a . . . behind the wheel apprenticeship program before beginning on solo status.

Quiles signed the Acknowledgment and Agreement. The Handbook also explained that Swift would assign an owner-operator mentor to Quiles, and that Quiles would drive with that individual to complete his 200 BTW hours. The Handbook includes paperwork for the mentor to fill out that includes a numeric score for various skills at several hour benchmarks throughout the mentee's training period.

Swift assigned Quiles to Johnson after Johnson requested and was approved to participate in the Mentor Driver program. Because he was an owner-operator, Johnson had authority over when he worked, and he could choose to not work for any reason. If Johnson did not work, then Quiles couldn't work. Johnson had the ability to choose when he was willing to accept a trainee driver in his truck, and mentors could discontinue their relationships with any trainee at any time for any reason. The trainee driver could also discontinue that relationship and ask for a new mentor.

### III. IOWA LAW GOVERNING WORKERS' COMPENSATION AND DUAL EMPLOYEES

At the relevant time, Iowa's exclusive remedy provision stated:

> The rights and remedies provided in this chapter, chapter 85A, or chapter 85B for an employee, or student participating in a work-based learning opportunity as provided in section 85.61 in account of injury, occupational disease, or occupational hearing loss for which benefits under this chapter, chapter 85A, or chapter 85B are recoverable, shall be the exclusive and only rights and remedies of the employee or student . . . .

IOWA CODE § 85.20 (2014). The statute defined "worker" or "employee" as: "a person who has entered into the employment of, or works under contract of service, express or implied, or apprenticeship, for an employer . . . ." *Id*. § 85.61 (11). "Employer" was broadly defined and included "a person, firm, association, or corporation[.]" *Id*. § 85.61 (2)(a).

Iowa law recognizes "dual employment"—that when one employer furnishes employees to others, "a 'special employer' to whom the 'brokered' employee is sent can also be an employer under Iowa's workers' compensation scheme." *Subcliff v. Brandt Engineered Products, Ltd.*, 459 F.Supp.2d 843, 850 (S.D. Iowa 2006) (citing *Swanson v. White Consol. Indus., Inc.*, 30 F.3d 971, 974–75 (8th Cir.1994); *Parson v. Procter & Gamble Mfg. Co.*, 514 N.W.2d 891, 894–96 (Iowa 1994); *Fletcher v. Apache Hose & Belting Co., Inc.*, 519 N.W.2d 839, 840–41 (Iowa App.1994); *Jones v. Sheller-Globe Corp.*, 487 N.W.2d 88, 93 (Iowa Ct. App.1992)) (additional citations omitted). Employment is created by express or implied agreement of the employer and the employee. IOWA CODE § 85.61(11). Iowa law starts with a presumption that the general employer "continues to be the sole employer" of the worker. *Parson*, 514 N.W.2d at 894; *see also Swanson*,

4

30 F.3d at 974. "In determining whether an alleged employer falls within the workers' compensation scheme the focus is on the agreement between an employer and worker." *Subcliff*, 459 F.Supp.2d at 851–52 (citing *id.*; *Rouse v. State*, 369 N.W.2d 811, 814 (Iowa 1985); 1B Arthur Larson, *The Law of Workmen's Compensation* § 47.10 at 8-304-309 (1993)). The issue of the parties' intent is "paramount." *Id.* (citing *Rouse*, 369 N.W.2d at 814).

Like most contract issues, whether the worker and alleged special employer intended to enter into an express or implied contract of employment is a fact issue.

> This question of fact . . . is resolved by examining evidence relevant to [the employee's] and [the purported employer's] intent to enter into such a contract. . . . Such evidence may consist of documentary evidence, as well as the testimony of [the general employer and special employer] employees. The evidence must show not only that [the purported employer] agreed to enter into a contract for service, but also that [the employee] had an informed and deliberate intent to do so.

*Id.* (quoting *Swanson*, 30 F.3d at 973). Iowa law states that "a contract will be implied where there has been a mutual manifestation of assent by acts and deeds (rather than words) to the same terms of an agreement." *Swanson*, 30 F.3d at 974 (quoting *McBride v. City of Sioux City*, 444 N.W.2d 85, 90 (Iowa 1989)). Further, "[t]he substance of such a contract must be determined from the acts of the parties in light of the subject matter and the surrounding circumstances." *Id.* (quoting *McBride*, 444 N.W.2d at 90). The Iowa Supreme Court has used a five-factor test to supplement the above analysis in determining whether an employment relationship has been formed, but "[t]he factors are only an aid to the analysis, and of secondary consideration to the contract requirement." *Parson*, 514 N.W.2d 891 (Iowa 1994) (citing *Henderson v. Jennie Edmundson Hosp.*, 178 N.W.2d 429, 431 (Iowa 1970)). The factors are:

> (1) the right to selection, or to employ at will;
> (2) responsibility for the payment of wages by the employer;
> (3) the right to discharge or terminate the relationship;
> (4) the right to control the work; and
> (5) is the party sought to be held as the employer the responsible authority in charge of the work or for whose benefit the work is performed.

*Henderson*, 178 N.W.2d at 431.

As noted by the parties, this case is factually distinct from many of the Iowa cases regarding

5

the exclusive remedy provision,[2] but the Court is unpersuaded by Quiles' contention that this case is wholly distinguishable from those cases.[3] For the exclusive remedy provision to apply, Iowa law requires that the "brokered" employee and the "special" employer intended to form an employment relationship by express or implied agreement.[4] The existence of their agreement is judged by standard contract principles. The Iowa Supreme Court has sometimes supplemented the implied contract analysis with a five-factor balancing test to assess the creation of an employment relationship, but the *Henderson* factors "are only an aid to the analysis, and of secondary consideration to the contract requirement." *Parson*, 514 N.W.2d at 891. Iowa law recognizes the concept of a dual employee, but includes a presumption that the original employer remains the sole employer of the "brokered" employee. This presumption is overcome if the employee and special employer intended to form an employment agreement as described above. If such an agreement was formed, the employee is a dual employee of the original and special employers and the exclusive remedy provision applies.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Med. Liab. Mut. Ins. Co. v. Alan Curtis L.L.C.*, 519 F.3d 466, 471 (8th Cir. 2008); *Kountze ex rel. Hitchcock Found. v. Gaines*, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."). In making this determination, the Court must examine the evidence in the light most favorable to the nonmoving party. *See HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir. 2007).

To survive a motion for summary judgment, a plaintiff must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Great Plains*

---

[2] First, this case does not involve an employment broker, which is the most common context in which these conflicts arise. Second, in most cases, there is not even the possibility of an express agreement between the employee and the special employer.
[3] Citation to cases involving employment brokers is unavoidable in this area of Iowa law and that employment model is analogous to the present case. Further, the public policy concerns recognized by the Iowa Supreme Court exist whenever a dual employer situation raises the question of whether the exclusive remedy provision applies.
[4] Here, Swift is the original employer, Quiles is the "brokered" employee, and Johnson is the "special" employer.

*Real Estate Dev., L.L.C. v. Union Cent. Life Ins. et al.*, 536 F.3d 939, 944 (8th Cir. 2008) (internal citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994) (internal citation omitted). "'[T]he substantive law will identify which facts are material.'" *Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 993 (N.D. Iowa 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**V. ARGUMENTS OF THE PARTIES**

In his motion, Johnson maintains that the undisputed facts show Quiles' intention was to work as an apprentice, student, or trainee for a mentor driver as assigned by Swift. [Dkt. No. 24] He argues that the parties intentionally and expressly agreed to this arrangement through their independent contracts with Swift. *Id.* Johnson argues that it is immaterial that neither party knew the identity of the other when they signed the documents in question because all the documents expressly contemplated the type of apprenticeship relationship the parties would enter into. *Id.* Additionally, Johnson relies on the facts that an apprentice is within the definition of an employee provided by Iowa Code § 85.61, and that Swift describes the training plan as an Apprenticeship Program. *Id.*; Iowa Code § 85.61. Johnson claims that given these facts, Quiles cannot be found to be anything other than an employee. [Dkt. No. 24]

Johnson argues that it is of no consequence if Quiles is simultaneously an apprentice to Johnson and employed by Swift, because Iowa law recognizes the concept of dual employment for loaned employees or borrowed servants. He emphasizes that his Independent Contractor Agreement provides that when an Owner Operator participates in Swift's Driver Mentor Program, the driver trainee "shall be considered a loaned employee or borrowed servant under applicable law." [Dkt. No. 24-1 p. 15] Johnson argues that under *Jones*, "a loaned employee" or "borrowed servant" is a person who is dually employed by both a general and special employer for purposes of applying the exclusive remedy provision. *Id.*; *see also Jones*, 487 N.W.2d at 91–92. As such, Johnson's intention to utilize the exclusive remedy provision was clearly expressed when he signed his contract with Swift. Johnson argues that Quiles' deposition testimony that he "wasn't even thinking" about the possibility of recovering in addition to workers' compensation benefits for an accident during his apprenticeship is evidence of Quiles' pre-accident understanding that he was

7

subject to the exclusive remedy provision. Johnson claims that subjecting Quiles to the exclusive remedy provision does not violate public policy because Quiles retained full workers' compensation coverage through Swift at all times.

Johnson also argues that the *Henderson* factors weigh in of the parties having formed an employer-employee relationship.[5]

Quiles argues that whether a contract of hire exists is ordinarily a fact question, and only becomes a question of law when only one inference can be reasonably drawn from the facts. Quiles argues that he and Johnson could not have expressly entered into a borrowed employment relationship through the two separate contracts each had with Swift. He also claims that the loaned employee and borrowed servant language in Johnson's Independent Contractor Agreement is at odds with other language of that contract which indicates that the driver trainee would remain the employee of Swift. Additionally, Quiles relies on language in his employment agreement with Swift which states that he remains an employee of Swift at all times and that Swift has the ability to discharge his employment at any time for any or no reason. Quiles then emphasizes that there is a presumption under Iowa law that Swift, the general employer, remained the sole employer of Quiles, the loaned or borrowed servant. Quiles correctly states that the threshold question for whether or not an the presumption is surmounted and an employee falls into the workers' compensation catchment area is whether the worker entered into an express or implied contract of hire with the special employer.

Turning to the question of whether an implied contract for hire existed between the parties, Quiles maintains that genuine issues of material fact preclude such a determination at the summary judgment stage. Quiles emphasizes that Iowa courts focus strongly on the employee's intent, arguing that when the employee stands to lose the right to sue the special employer, "the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit." *Parson*, 514 N.W.2d at 894–95 (noting that it is a general rule of contract law that "determination of the intent of the parties to make a contract, as gathered from what they did and said, is normally a question

---

[5] For reasons made clear in the Court's analysis, the Court does not place much importance on the *Henderson* factors in this case. Johnson argues, in order, that: (1) he had the right to select or employ an apprentice at will; (2) he directly affected Quiles' wages by setting the hours that he worked; (3) he had the right to terminate his relationship with Quiles for any reason; (4) he had the right to control Quiles' work; and (5) he directly benefited from the work Quiles performed.

8

of fact for the jury"). Quiles states that he never intended to form any kind of employment relationship with Johnson and that only conjecture, not evidence, supports the notion that he did.

Quiles argues that the *Henderson* analysis supports his argument that there was no implied contract for hire between the parties.[6]

## VI. ANALYSIS: THE UNDISPUTED FACTS DEMONSTRATE THE PARTIES INTENDED TO FORM AN EMPLOYMENT RELATIONSHIP

The Court finds that the undisputed facts submitted by the parties permit only one conclusion: that Quiles and Johnson intended to enter into an express or implied agreement creating an employer-employee relationship between the two of them such that: (1) during his apprenticeship, Quiles was a dual employee of Swift and Johnson; and (2) the exclusive remedy provision of Iowa's Workers' Compensation statute applies. Because Quiles stands to lose his ability to sue in tort, the Court places emphasis on his demonstrated intent to form an employer-employee relationship with Johnson. Further, the Court begins the analysis with the presumption that Swift remained Quiles' sole employer.

First, the Court holds that the individual contracts each party signed with Swift demonstrate express agreement by each party to enter into an employment relationship with the counterpart Swift eventually assigned. Neither party suggests that either contract was signed with anything less than an informed and deliberate intent to enter into the agreement. If the parties' contracts with Swift do not indicate their assent to the formation of an apprentice-mentor relationship with a counterpart as described, then the contractual language describing the training program would be meaningless. Both contracts describe the parties' respective obligations under Swift's driver training program. Quiles was provided with a handbook stating that a condition of his employment with Swift was a 200-hour behind-the-wheel apprenticeship program with an experienced mentor driver, and he acknowledged the information contained in the handbook. Johnson's contract with Swift contained specific language identifying any trainee driver as a loaned employee or borrowed servant. Contrary to Quiles' assertion, the language in his contract with Swift does not conflict with the loaned employee or borrowed servant language in Johnson's contract—in the absence of contractual language identifying Swift as the sole employer of Quiles, there is no contract-based

---

[6] For reasons made clear in the Court's analysis, the Court does not place much importance on the *Henderson* factors in this case. Quiles argues, in order, that: (1) Johnson did not select nor could he terminate Quiles as an employee of Swift; (2) Johnson did not pay Quiles or provide employment benefits; (3) Johnson could not discharge Quiles' employment with Swift; (4) Johnson did not control Quiles' work to the degree required; and (5) Quiles' activities benefited Swift more than they did Johnson.

barrier to his classification as a dual employee of Swift and Johnson during the time of his apprenticeship.

The question of whether Johnson can overcome the presumption that Swift remained Quiles' sole employer is answered by examining whether Quiles' "act and deeds (rather than words)" indicate assent to the terms of the agreement. *Swanson*, 30 F.3d at 974. Quiles must have "had an informed and deliberate intent" to form the employer-employee relationship. *Subcliff*, 459 F.Supp.2d at 851–52. The most persuasive action Quiles took was when he agreed to participate in the apprenticeship program as described in his employment agreement with Swift. All his subsequent actions demonstrate a continuing commitment to the apprenticeship program. Quiles agreed to accept a mentor in order to finish his apprenticeship. He then went to work with Johnson and participated in a team driving arrangement for four days before the collision occurred. He was free to end the relationship at any time and request a new mentor, but he did not do so. From having reviewed the VIP materials when he began his employment, Quiles was aware of the mentor's role in evaluating and training him during his apprenticeship, and of the fact that Johnson could indirectly control Quiles' pay by choosing when the semi would be operational. By performing work with Johnson and continuing to do so for four days, Quiles indicated he assented to the apprentice-mentor relationship. It is particularly telling that Quiles continued to work with Johnson given that he had terminated his relationship with another mentor because he was dissatisfied with the prior mentor's work habits. These actions demonstrate that he assented to the formation of an employer-employee relationship with Johnson. Johnson does not contest that he intended to form an employment relationship with Quiles. Quiles was a dual employee of Swift and Johnson during the period of his apprenticeship.

Second, even if the parties did not expressly agree to enter into an employer-employee relationship, the Court finds that such a contract is implied by their mutual assent to the relationship as shown by their actions leading up to the collision. Again, the intent of the parties is paramount. As described above, Quiles intended to assent to the employment relationship. Johnson's intent is uncontested, but is demonstrated by his application to participate in the apprenticeship program as a mentor and his decision to notify Swift that he was available to accept a student driver. His continuing assent to the relationship is shown by his decision to initiate a team-driving arrangement with Quiles once they were paired. Johnson, like Quiles, could have ended the apprenticeship at any time, but he did not. Both parties participated in their assigned role in Swift's

apprentice-mentor program until the collision, thus manifesting their mutual assent to classification as apprentice and mentor. Pursuant to Iowa Code Chapter 85A, Quiles, as an apprentice, was an employee of his mentor, Johnson, during the apprenticeship. As his contract with Swift stated that he would always remain a Swift employee, he was dually employed by Johnson and Swift at all relevant times, and is therefore subject to the exclusive remedy provision.

Because the Court has found that both an express and implied agreement existed between the parties, the *Henderson* analysis is unnecessary.

## VI. CONCLUSION

Defendant Alan Johnson's Motion for Summary Judgment is **GRANTED** as to all counts. The undisputed facts allow only one conclusion: that Johnson and Plaintiff Rigoberto Quiles agreed by express or implied means to the formation of an apprentice-mentor relationship that falls with the definitions of employer and employee under Iowa Code Chapter 85A, making Quiles a dual employee of Swift Transportation Company of Arizona and Johnson and triggering the exclusive remedy provision of Iowa's Workers' Compensation statute.

Upon the foregoing,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to all counts. **IT IS FURTHER ORDERED** that Plaintiff's First Amended Complaint is **DISMISSED** in its entirety. The Clerk shall enter judgment accordingly.

**DATED** this 5th day of September, 2017.

JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA